OSCN Found Document:McCLEARY v. NEXSTAR MEDIA GROUP, et al.

 

 
 McCLEARY v. NEXSTAR MEDIA GROUP, et al.2025 OK CIV APP 40Case Number: 122763Decided: 12/03/2025Mandate Issued: 12/31/2025THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2025 OK CIV APP 40, __ P.3d __

 

CHRISTOPHER RENYLES McCLEARY, an individual, Plaintiff/Appellee,
vs.
NEXSTAR MEDIA GROUP, INC., a Foreign Corporation; and TRIBUNE BROADCASTING COMPANY II, a foreign limited liability company, Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE RICHARD OGDEN, TRIAL JUDGE

AFFIRMED

Donald E. Smolen, II, Michael F. Smith, Dustin J. Vanderhoof, SMOLEN | LAW, PLLC, Tulsa, Oklahoma, For Plaintiff/Appellee

Robert D. Nelon, Jon Epstein, HALL, ESTILL, HARDWICK, GABLE GOLDEN & NELSON, P.C., Oklahoma City, Oklahoma, For Defendant/Appellant

STACIE L. HIXON, VICE-CHIEF JUDGE:

¶1 Nexstar Media Group, Inc. ("Nexstar") appeals the trial court's December 3, 2024, Order denying Nexstar's Motion to Dismiss under the Oklahoma Citizen's Participation Act ("OCPA"). McCleary brought suit against Nexstar for defamation, after Nexstar undisputedly but mistakenly ran his photograph in a news segment concerning a different Christopher McCleary in Texas, who had been charged with sex trafficking. In its Motion, Nexstar asserted that McCleary failed to establish by clear and specific evidence the element of fault amounting to at least negligence to support his defamation claim, because McCleary had not presented expert testimony. The trial court found McCleary met this threshold showing and that the evidence presented raised questions of fact on the issue of Nexstar's fault. Based on our review of the briefs and appellate record, we affirm the trial court's Order.

BACKGROUND

¶2 On October 4 and 5, 2021, KFOR, a news station located in Oklahoma and owned by Nexstar, presented a news segment about several individuals who had been prosecuted for charges of human sex trafficking in Texas federal court. One of the defendants in that case was named Christopher McCleary. With that segment, KFOR ran a photograph of Appellee, an Oklahoma resident, Christopher Renyles McCleary ("McCleary"). However, the defendant named in the Texas criminal case was Texas resident, Christopher Lynn McCleary. The Appellee, McCleary, was not related to nor was he charged with any of the crimes discussed in Nexstar's report. This story was featured in broadcasts in both Texas and Oklahoma. 

¶3 McCleary brought the underlying action against Nexstar and Tribune Broadcasting Company II, LLC ("Tribune") alleging defamation, false light, and intentional infliction of emotional distress. 

¶4 McCleary conducted discovery and deposed KFOR producer, Cristi Jill Wolf ("Producer"), who prepared the original story. Thereafter, McCleary responded to Nexstar's original Motion to Dismiss presenting his proposed evidence in support of the elements of his defamation claim. Essentially, McCleary presented evidence that Producer originally learned of the story from a Texas news station concerning a sex trafficking ring operating in North Texas and Oklahoma. She thought the story would be of interest because one of the other defendants involved was a football player originally from Oklahoma. However, she noticed that there was no photo included for one suspect, Christopher McCleary, and thought the story would be more appealing with a photograph. Producer or those assisting her attempted to locate a photo of the man implicated in the incident solely by checking the website of the Oklahoma Department of Corrections (ODOC), where she obtained a mugshot of McCleary from an unrelated conviction.

¶5 McCleary presented Producer's deposition testimony that she had been trained to verify the identities of criminal defendants before running stories by reviewing items such as court documents, news sources, police sources, Oklahoma State Bureau of Investigation (OSBI) reports, Public Access to Court Electronic Records (PACER), Oklahoma State Court Network (OSCN), or the Texas court system. However, Producer testified she did not recall verifying McCleary's identity by reviewing the court documents in the Texas case or checking any other source other than pulling his photo from the ODOC website. McCleary also presented evidence which he contended demonstrated that Nexstar would have learned he was not the Christopher McCleary charged in the sex trafficking case, had it taken steps to verify his identity.

¶6 Nexstar presented "rebuttal" evidence in reply to McCleary's response. It presented the affidavit of Producer and her supervisor, KFOR's News Director, as proposed television news experts. These proposed experts contended that Producer exercised the same degree of care ordinarily prudent persons in the same kind of business would have used, and claimed to have had no reason to suspect McCleary was not the individual referenced in the news reports. They also contended the news story they presented was based on a story from a Texas news station, which the News Director averred it had no obligation to "reinvestigate," though Nexstar acknowledged the original story never included a picture of the suspect Christopher McCleary. However, Producer contended the sex trafficking case concerned crimes in both Texas and Oklahoma, and that McCleary's name was sufficiently unusual to reasonably assume the McCleary on the ODOC website was the same person charged in Texas.

¶7 Nexstar argued that it was not professionally negligent, based on the affidavits presented, and that McCleary had failed to present conflicting expert testimony supporting his prima facie case. Thus, Nexstar contended it was entitled to dismissal of Plaintiff's claims under the OCPA. The trial court found that McCleary presented clear and specific evidence in support of a prima facie case of defamation, and that Nexstar's defenses presented questions of fact, not law, which the trial court could not decide at that stage. The trial court denied the Motion to Dismiss.

¶8 Nexstar appeals.

STANDARD OF REVIEW

¶9 For cases such as the one at hand, this court has applied a de novo standard of review. Thacker v. Walton, 2021 OK CIV APP 5Kluver v. Weatherford Hosp. Auth., 1993 OK 85859 P.2d 1081

ANALYSIS

1. Requirement of experts in OCPA actions

¶10 Nexstar asserts that the trial court erred by denying its motion to dismiss, because McCleary failed to present expert testimony to support a prima facie showing of fault amounting to at least negligence.

¶11 "If a legal action is based on, relates to or is in response to a party's exercise of the right of free speech, right to petition or right of association, that party may file a motion to dismiss the legal action." 12 O.S.2021, § 143212 O.S.2021, § 1431Southwest Orthopaedic Specialists, PLLC v. Allison, 2018 OK CIV APP 69439 P.3d 430prima facie showing of each element of the claimed cause(s) of action" by "clear and specific" evidence. Id. at ¶ 11. See also (C). If that burden is satisfied, the burden shifts back to defendant to present a defense to the claims by a "preponderance of the evidence." Id. § 1434(D). Dismissal based on such a defense may only be obtained if it is one at law. See Krimbill, 2018 OK CIV APP 37

¶12 McCleary conceded that Nexstar met the first stage of an OCPA action. McCleary was then obligated to establish his prima facie case by clear and specific evidence. In order to recover for defamation, a private figure must prove "(1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication." Springer v. Richardson Law Firm, 2010 OK CIV APP 72239 P.3d 473. Malson v. Palmer Broad. Grp., 1997 OK 42936 P.2d 940

¶13 Nexstar contends that Malson required McCleary to present expert testimony to establish a journalist's standard of ordinary care, i.e., fault amounting to at least negligence, in response to its Motion.

¶14 Malson was a defamation case against a television broadcasting group. On summary judgment, defendant and plaintiff presented conflicting expert affidavits regarding whether the news station's actions fell below the degree of ordinary care applicable to one in its business. Malson, 1997 OK 42Id. at ¶ 8. In that case, the Court recognized that a news station must exercise ordinary care, defined as the degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under similar circumstances. Id. at ¶ 10. Failure to exercise that ordinary care is fault amounting to at least negligence. See id. at ¶ 9.

¶15 The Malson Court recognized that the "best evidence" of ordinary care is that which "ordinarily prudent persons, engaged in the same kind of business, customarily exercised and commonly do exercise under similar circumstances." Id. at ¶ 10 (citing Martin v. Griffin Television, Inc., 1976 OK 13549 P.2d 85Id. Nexstar interprets Malson as requiring McCleary to present expert testimony to demonstrate fault amounting to at least negligence and requiring the trial court to dismiss McCleary's claim here, notwithstanding the evidence McCleary did present. Nexstar presents no authority demonstrating that the OCPA requires parties to present expert affidavits or testimony at the motion to dismiss stage, but simply asserts that the nature of the case requires such testimony. Meanwhile, McCleary argues that such a requirement would violate constitutional prohibitions on affidavits of merit required for filing professional negligence actions.

¶16 In Oklahoma jurisprudence, "[t]he terms 'affidavit of merit' or 'certificate of merit' are generic terms applied to a variety of special certifications--usually supplied by medical experts--that verify the legitimacy of claims involving professional standards of care." Zeier v. Zimmer, Inc., 2006 OK 98152 P.3d 861Wall v. Marouk, 2013 OK 36302 P.3d 775See also John v. Saint Francis Hosp., Inc., 2017 OK 81405 P.3d 681

¶17 Arguably, requiring expert testimony at this stage would invoke a similar concern. Given the time frames imposed by the OCPA, plaintiffs would be required to obtain expert testimony before filing the case or shortly thereafter to meet their "clear and specific" evidence burden in response to a Motion to Dismiss. However, the OCPA does not actually contain an "affidavit of merit" requirement or any restriction on a plaintiff's ability to file suit, if he has basis to do so. The question is whether the Act's requirement that a party present "clear and specific" evidence requires expert testimony at this stage of a case.

¶18 The OCPA's purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." 12 O.S.2021, § 1430Thacker, 2021 OK CIV APP 5more specific than that required to resist a traditional motion to dismiss, in that something more than formulaic recitals of elements and a simple claim of damages is necessary." Southwest Orthopaedic, 2018 OK CIV APP 69

¶19 While this "somewhat more specific" showing clearly requires parties to go beyond vague notice pleading and disclose the factual basis for their claims, we question whether the Act intended to impose a burden to present expert testimony at the inception of the case. See Southwest Orthopaedic, v. Allison, 2018 OK CIV APP at 69 (quoting In re Lipsky, 460 S.W.3d at 591).

¶20 Further, even if expert testimony is required at this stage, we find McCleary established a prima facie case here. Under these facts, expert testimony was not required. Alternatively, McCleary met his burden through testimony of Nexstar's own expert.

¶21 Although Malson stated that expert testimony would ordinarily be the "best evidence" of ordinary care, at no point did it suggest expert testimony was the sole method of proving it, or that it was required in every case. See Malson, 1997 OK 42Boxberger v. Martin, 1976 OK 78552 P.2d 370Id. 

¶22 Here, Nexstar does not appear to genuinely dispute that it generally has an obligation to report truthfully or accurately, or that its duty of ordinary care would include correctly identifying those accused of crimes. 

¶23 Producer acknowledged she is trained to verify criminal defendants' identities and that means exist to do so through court documents or various court databases. She testified that she had been trained to use court documents, news sources, police reports, OSBI reports, OSCN, etc. Producer and KFOR employees have access to PACER, which has access to the Texas federal case at issue. However, she testified she did not recall making any of these efforts in McCleary's case. She obtained a photo of McCleary from the ODOC website and did nothing further to verify whether he was the defendant in the Texas news story. 

¶24 Particularly, Producer testified, as follows:

Q. (By Mr. Vanderhoof) ...

Does KFOR fact-check stories that it's going to put on the air?

A. Absolutely.

Q. How does KFOR do that?

A. By going to sources and research, using what information is available to verify.

Q. Okay. Is there training on what sources to use to do research?

A. MR. NELON: Object to the form.

THE WITNESS: Yes.

Q. (By Mr. Vanderhoof) What kind of training does KFOR provide on researching sources?

A. Again, on the job, through our managers.

Q. Okay. What sources are used in a story about a criminal prosecution to verify identifications?

A. Court documents.

Q. Okay.

A. Official documents.

Q. You say official--

A. Or other news sources.

Q. Okay. Are those all--when you say, "official documents," what do you mean by that?

A. We've got police reports, OSBI reports, court documents.

Q. When you say, "court documents," are you talking about somebody going to the court dockets and pull the file?

A. That can happen, yes.

Q. So if it was state court--have you ever heard of OSCN?

A. Yes.

Q. Have you ever used OSCN to do research?

A. Yes.

***

Q. How about PACER, have you ever heard--do you know what PACER is?

A. I've heard of PACER.

Q. Have you ever used PACER?

A. I have not.

Q. Have you ever logged in--let me ask you this. Does KFOR have anybody that has access to PACER?

A. Absolutely.

Producer also acknowledged she had asked for others to obtain court documents to verify a story.

Q. Okay. Have you ever logged in and obtained a court document from a federal court case file?

A. I have not.

Q. Okay. Have you ever asked somebody to do that for you?

A. Yes.

Q. How many times?

A. No clue.

Q. Has it been a lot?

A. I would imagine.

Q. And why would you have somebody go and pull something from a federal court website?

A. To verify a story, get the facts.

Q. Okay. Because that's something that you want to do to make sure you have all the facts correct?

Q. Correct.

However, despite indicating she had the means to have others research and verify a defendant's identity, Producer did not remember asking anyone to pull the documents related to the Texas criminal case and does not recall looking for information in Texas regarding the story. She could not rule out whether such steps were required:

Q. Okay. But you--but when you--if we look at your--what you did in this case, you only looked at the Oklahoma DOC for Mr. McCleary's mug shot, right?

A. I don't recall we looked at Texas.

Q. Well, it doesn't say that you did.

A. Okay.

Q. What it says here is--in paragraph ten--"Because the four men had some level of connection to Oklahoma, I thought if McCleary had a previous criminal record the Oklahoma Department of Corrections might have information about him."

A. Correct.

Q. Okay. I'm asking if you had known about the Texas stuff involving Mr. McCleary would you have also looked at Texas?

A. Yes.

Q. But it doesn't say that you did here.

A. Correct.

Q. Would that have been proper due diligence to also go and look at Texas?

A. I'm not sure.

Q. Why aren't you sure?

A. Because I can only look at it hindsight now.

Nexstar suggested that we disregard Producer's testimony because the questioning was too "broad," but offered no other reason why the Court should disregard Producer's own testimony establishing her regular practices, and that she did not follow them. 

 

2. Presumed/punitive damages 

¶25 Nexstar also asserts that, even if McCleary's claims for actual damages remain, the trial court should have dismissed McCleary's claims for punitive and presumed damages due to a lack of clear and specific evidence of actual malice.

¶26 Both parties acknowledge that McCleary cannot recover presumed damages or punitive damages against Nexstar unless he establishes that Nexstar acted with "actual malice." See generally Martin v. Griffin Television, Inc., 1976 OK 13549 P.2d 85actual damages and has thus met each element of a prima facie case.

¶27 We find no Oklahoma Supreme Court authority which addresses this issue. However, we find it unnecessary to resolve because McCleary has met his burden at this stage to support claims based on actual malice by clear and specific evidence.

¶28 Actual malice is defined as a statement that is made "with knowledge that it was false or with reckless disregard of whether it was false or not." Martin, 1976 OK 13

¶29 "Reckless disregard is a subjective standard, focusing on a defendant's state of mind." Krimbill, 2018 OK CIV APP 37See Jurkowski v. Crawley, 1981 OK 110637 P.2d 56Id. at ¶ 13. Plaintiff must show the defendant "in fact entertained serious doubts as to the truth of his publication," or had a "high degree of awareness of . . . [the] probable falsity" of the published information. Krimbill, 2018 OK CIV APP 37Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 687, 688 (1989)). "Such 'subjective' awareness of probable falsity. . . may be found if there are obvious reasons to doubt the veracity of the information or accuracy of his reports." Jurkowski, 1981 OK 110Herbert v. Lando, 441 U.S. 153 (1979)); see also Martin, 1976 OK 14

¶30 Nexstar generally supplies applicable cases but its argument largely sidesteps the "reckless disregard" aspect of actual malice. It points out that actual malice cannot be premised on its apparent failure to investigate McCleary's identity. It also argues McCleary did not present "any" evidence that "Nexstar employees knew or had an actual awareness at the time of the broadcast that anything said about the plaintiff was false."

¶31 Nexstar is correct that McCleary did not present direct evidence of its knowledge of the falsity of its broadcast, or that it knew it was probably false. Nexstar is not correct that McCleary did not present "any" evidence on this point. As recognized in Krimbill, a plaintiff is entitled to rely on circumstantial evidence to establish his prima facie showing of actual malice. To consider this issue, evidence must be viewed in its entirety, and proof of actual malice is not defeated by a "self-serving protestation of sincerity." 2018 OK CIV APP 37McFarland v. Le-Vel Brands, LLC, 2017 WL 1089684, at *12 (Tex. App. Mar. 23, 2017).

¶32 Though Producer's failure to investigate, even if negligent, cannot support a showing of actual malice, what she knew or did not know when she published McCleary's photo is arguably relevant to whether she had knowledge or doubts as to its falsity. McCleary presented evidence that Producer displayed his photo, without doing anything other than pulling his mugshot from the ODOC website. Producer did not claim to have acted in necessary haste or on word of a third party. She merely added McCleary's mugshot to add visual interest to the story.

¶33 When deposed, Producer could not identify what news story she relied upon to craft her segment or any background information she obtained supporting it. She could offer nothing about her subjective mental state, other than to state it appeared she made a mistake. However, in the testimony provided, she also offered no reason why she concluded McCleary was the same Christopher McCleary in the Texas criminal prosecution, other than the case's connection to Oklahoma and the fact he had a mugshot in Oklahoma. She volunteered no identifying factor that would lead one to conclude these may be the same people. She did not suggest McCleary had been convicted of a similar crime or offer information that might suggest McCleary was connected to the other defendants. In short, apart from the availability of his mugshot, Producer did not identify anything supporting her belief McCleary was the same Christopher McCleary in the Texas story.

¶34 From the totality of evidence presented, we conclude McCleary presented clear and specific evidence from which a reasonable person could conclude that Producer had no reasonable basis to conclude McCleary was the defendant charged in the Texas case, and clear and specific evidence to support prima facie actual malice based on high degree of awareness of the probable falsity of the report and/or obvious reasons to doubt the veracity of the report. We acknowledge that "actual malice" is a high standard. However, McCleary is not obligated at this stage to present the level of proof necessary to prevail or sufficient to persuade a jury against Nexstar's conflicting evidence at trial. He is required to present something more than notice pleading, a factual basis for the elements of his claim. In Krimbill, another division of this Court affirmed a trial court's denial of an OCPA motion to dismiss, based on its finding that "the limited circumstantial evidence indicated the possibility of actual malice." Id. at ¶ 60. We affirm the trial court's denial of Nexstar's Motion to Dismiss on this same basis, based on McCleary's presentation of circumstantial evidence that Nexstar acted with reckless disregard of whether its report was false or not.

CONCLUSION

¶35 For the foregoing reasons, we affirm the trial court's Order Denying Defendants' Motion to Dismiss Under the Oklahoma Citizen's Participation Act of December 3, 2024.

¶36 AFFIRMED.

BARNES, P.J., and HUBER, J., concur.

FOOTNOTES

de novo standard. The OCPA also requires dismissal if a plaintiff fails to show a prima facie case, and is hence similar to a motion for directed verdict. Directed verdict challenges also are reviewed de novo. Finally, Texas, which has an almost identical act, has adopted a de novo standard of review. Hence, we find a de novo standard indicated by existing precedent and persuasive authority, and we adopt that standard here." Krimbill v. Talarico¸ 2018 OK CIV APP 37417 P.3d 1240

Malson does not impose "professional negligence" standards and sets the standard at ordinary care. Malson establishes the standard is ordinary care, but establishes that ordinarily, evidence of journalists' customs and practices may be required to address that standard. The trial court does not appear to have deviated from that point but declined to require expert testimony in response to an OCPA motion to dismiss. However, we need not resolve whether one should characterize this a "professional negligence" standard, or one of ordinary care to address this appeal. We assume that expert testimony or other evidence of journalists' practices or customs may ultimately be needed in some cases, just as is described in Malson, where the parties have supplied no authority suggesting a change in that law. To the extent the trial court erred, "[i]f the trial court reaches the correct result but for the wrong reason, its judgment is not subject to reversal. Rather th[is] Court is not bound by the trial court's reasoning and [we] may affirm the judgment below on a different legal rationale." McKiddy v. Alarkon, 2011 OK CIV APP 63254 P.3d 141Dixon v. Bhuiyan, 2000 OK 56

Robins v. Clinkenbeard, No. 1-19-00059-CV, 2020 WL 237943 (Tex. App. Jan 16, 2020) in support of his position that expert testimony should not be required at this stage under the OCPA. Robins concerned a client's legal negligence claim against a lawyer. The lawyer moved to dismiss the case under the Texas Citizen's Participation Act, Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b), arguing the suit was based on his exercise of free speech. Clients were required to present a prima facie claim supported by clear and specific evidence, like the Oklahoma statute. The lawyer argued their claim failed because, though the clients provided affidavits outlining specific acts of the lawyer's alleged negligent conduct, the client did not present expert testimony in support of the lawyer's breach of his professional standard of care. In that case, the court refused to require expert testimony, explaining:

Robins does not provide any authority for his assertion that establishing clear and specific evidence of a prima facie case requires expert testimony. Cf. Moldovan v. Polito, No. 05-15-01052-CV, 2016 WL 4131890, at *15 (Tex. App.--Dallas Aug. 2, 2016, no pet.) (mem. op.) (holding that because "clear and specific evidence" means "enough detail to show the factual basis for [plaintiff's] claim," lack of expert testimony on damages "is not fatal to [nonmovant]'s prima facie case") (quoting In re Lipsky, 460 S.W.3d at 590). And the text of the TCPA states no such requirement. Cf. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (requiring plaintiff asserting health care liability claim to serve statutorily sufficient expert report to avoid dismissal). And requiring a party to present expert testimony to avoid dismissal so early in the life of a lawsuit, in most cases before discovery has even begun, would be inconsistent with the Texas Rules of Civil Procedure, which generally do not require disclosure of experts until 90 days before the end of the discovery period. Compare TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(b) (stating that deadline to file TCPA motion to dismiss is 60 days after service of legal action), with TEX. R. CIV. P. 195.2(a) (requiring parties seeking affirmative relief to designate experts 90 days before end of discovery period or 30 days after served with request, "[u]nless otherwise ordered by the court").

Finally, requiring a nonmovant to provide expert testimony to defeat dismissal of his claims at the TCPA stage asks more of him than the Texas Supreme Court has held his burden to be: to provide a "minimum quantum" of clear and specific evidence to support a rational inference that his allegations of fact are true on each element of each claim. See In re Lipsky, 460 S.W.3d at 590. In any event, expert testimony is not always necessary for a plaintiff to prevail on a legal malpractice claim. See Alexander v. Turtur & Assocs., Inc., 146 S.W.3d 113, 119 (Tex. 2004) (holding that although expert witness testimony is required in legal malpractice cases when causal link is "beyond the jury's common understanding," "[i]n some cases the client's testimony may provide this link").

Id. at *10. Because our act was taken from the TCPA, we may consider Robins as persuasive authority. See Krimbill, 2018 OK CIV APP 37Robins relies in part on In re Lipsky, 460 S.W.3d 579, 591 (Tex. 2015), which considered the plaintiff's burden to establish the elements of his prima facie case by "clear and specific evidence" under the similar TCPA. In that case, the Texas Supreme Court held that general allegations of the elements of a claim is not enough, and plaintiff must provide "enough detail to show the factual basis for its claim." Id. at 590-591. Thus, the plaintiff must present "pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff" to resist a TCPA motion to dismiss. Id. at 591.

Wiley v. Ohio/Okla. Hearst Argyle Television, Inc., 33 Fed. Appx. 434 (10th Cir. 2002), asserting that a lay person cannot infer negligence from alleged errors in reporting. While this is so, Wiley is distinguishable from the instant case. In Wiley, plaintiff presented no evidence other than that the report was allegedly incorrect or false, and thus no evidence regarding the news station's standard of care or breach of ordinary care. Meanwhile, the news station presented an affidavit that it complied with the standard of care. Here, McCleary has not relied solely on the fact the report was false, as discussed further below.

See also Choctaw Town Square, LLC v. KOKH Licensee, LLC, CIV-13-1246-F, 2015 WL 11661754 (W.D. Okla. Jun. 6, 2015)(unpublished). In Choctaw Town Square, plaintiff alleged that a news station falsely represented that plaintiff committed fraud against the City of Choctaw based on a state auditor's report, among other things. Plaintiff contended the report contained no finding of fraud and that the statements were false and defamatory. The news station moved for summary judgment because plaintiff had not presented expert testimony that defendant had violated its standard of care, relying on Malson and Wiley. The court found these cases distinguishable, holding that "[g]iven the simplicity of [plaintiff's] factual theory, expert testimony is not needed." Id. at *10. "A side by side comparison of the audit report and the news report is within the ken of the average juror." Id. The court found that, once the jurors drew inferences that would flow from the comparison, "they will be in good position to fairly intelligently evaluate the parties' contentions as to what they should conclude under the applicable law of defamation." Id.

Wishon v. Hammond, 2023 OK CIV APP 36538 P.3d 1197